GEORGE S. PERRY *vs.* SAMUEL M. PRATT.

The issuing of commissions to ascertain lost boundaries is a very ancient branch of equity jurisdiction, and our statute conferring equity jurisdiction (Rev. Stat., tit. 5, § 20,) is broad enough to embrace it.

Under that statute, however, the jurisdiction was limited by the rule as to adequate remedy at law, and there must have been some peculiar equity attaching to the controversy to authorize courts of equity to take jurisdiction.

The act of 1859, which provides that in the case of a lost, obscure or uncertain boundary an adjoining proprietor may bring his petition to the superior court, and that that court as a court of equity may order the bounds to be ascertained and established, and may appoint a committee to inquire into the facts and establish the bounds and report to the court, which may confirm their doings by its decree, confers a jurisdiction upon the court which is not dependent on the want of adequate remedy at law.

The court acts under the statute as in ordinary cases in equity, and is not bound to confirm the doings of the committee, but may, where the facts reported are not sufficient to justify a decree for the petitioner, dismiss the bill.

A lost or uncertain boundary under the statute is a boundary which has lost its distinctive character as such by removal, displacement, decay or change, so that it no longer answers the purpose of a bound in defining the true line. It is immaterial whether it be a natural or artificial object.

Where the boundary between two tracts of land lying on Long Island Sound was a creek emptying into the sound, and the mouth of the creek, by reason of the accumulation of sand along the shore, became changed from time to time, so that the dividing line between the tracts was no longer indicated by it with any certainty, it was held to be a case of lost and uncertain boundary under the statute.

The committee fixed a bound as near the true line as they were able to ascertain

Perry v. Pratt.

it, not by opening the creek at its former mouth, but by establishing an artificial bound. Held that this was a proper course.

Where a boundary though changed has been acquiesced in with knowledge of the facts for fifteen years, it can not be restored. It establishes a new line between the parties.

BILL in equity for the establishment of a lost and uncertain boundary, under the act of 1859, authorizing certain proceedings in equity in such cases.*

The bill alleged that the petitioner was the owner of a certain tract of land, situated in the town of Westbrook, containing about six acres, bounded easterly on land of the respondent, southerly on Long Island Sound, northerly on the petitioner's land, and westerly on land of Amasa Spencer; and that the respondent was the owner of a certain other tract adjoining to that of the petitioner, containing about seven acres, bounded westerly on land of the petitioner, southerly on Long Island Sound, northerly on land of A. G. Spencer, and easterly on land of the estate of Michael Hill; that the petitioner and respondent were adjoining proprietors in severalty of said tracts, and that the same were for a considerable distance sepa-

---

* The statute of 1859, under which the petition was brought, is as follows :—

" Whenever the boundaries of lands between two or more adjoining proprietors shall have been lost, or by time, accident or any other cause shall have become obscure or uncertain, and the adjoining proprietors can not agree to establish the same, one or more of said adjoining proprietors may bring his petition in equity to the superior court for the county in which such lands or a portion of them are situated, and such superior court, as a court of equity, may upon such petition order such lost and uncertain bounds to be erected and established ; and for that purpose may appoint a committee of not more than three able, judicious and disinterested freeholders of this state, who shall issue due and reasonable notice to all parties interested in said lands, to appear before them ; and said committee shall take the oath hereinafter provided, and shall, as soon as may be, inquire into the facts, and proceed to erect and establish such lost and uncertain bounds, and when necessary may employ a surveyor to assist therein ; and said committee shall, as soon as may be, report the facts and their doings to the superior court, pursuant to their appointment ; and if said court shall find said parties have been duly notified and heard, or had an opportunity to be heard, they may approve and by decree confirm the doings of said committee ; and certified copies of said report and decree shall be recorded in the records of the town or towns in which said lands are situated, and the bounds so erected and established shall be the legal bounds between said adjoining proprietors."

Another section provides the form of oath for the committee.

rated by a small creek running across the beach and emptying into the sea ; that by the force of the sea, produced by violent storms and extraordinary tides, and by other natural causes, the course and direction of the creek across the beach, and the beach itself, had changed, so as to wholly efface and render uncertain the boundary line between the petitioner's and the respondent's lands, and that the petitioner and respondent were unable to agree where the true boundary line across the beach between their lands was, and could not agree between themselves to establish and determine the same. And the petitioner prayed the court to appoint a committee of not more than three judicious and disinterested freeholders of this state, to inquire into the facts and establish the boundary.

The respondent filed the following answer :—

The respondent denies the truth of the allegations in the petition set forth, and says that it is not true that there are any lost and uncertain bounds between said parties, but that there is a natural boundary in the place in question between the respective premises of said parties, to wit, a creek or arm of the sea, which has been the well established, always recognized, and well known boundary for more than half a century past, and that no other boundary can be made so good as the present well defined boundary, which has been always referred to during all time past, in the title deeds of said premises and in those of both the petitioner and the respondent ; and the respondent further says that the matters alleged in said petition are insufficient in the law.

The case was referred under the statute to a committee, who made the following report :

The petitioner and respondent own the respective tracts of land described in the petition, and said tracts adjoin. The owners of the premises of the respondent, including the respondent himself, and the owners of the premises of the petitioner prior to the petitioner himself, whose deed bears date Dec. 18, 1854, have, from before the year 1808, recognized as the division boundary line between their respective premises for a considerable distance next Long Island Sound, a small brook, which flows through a narrow ditch in a generally

southerly course and empties into the creek referred to in the petition and answer, and from thence to the sound the said creek. In the title deeds conveying the petitioner's premises from owner to owner they are, on the side adjoining the premises of the respondent, repeatedly bounded as running southerly " by " or " on " the said " brook to. the sea." In the deed to the petitioner, however, his premises are on that side bounded only by the respondent's premises, by the name of the then proprietor. In the deeds from owner to owner of the respondent's premises, the same are usually bounded on the petitioner's premises, by the name of the proprietors thereof, without more. The course of the brook is southerly where it meets the creek, but from that point the creek begins to turn westwardly, and has a course generally westwardly until, at its mouth, it opens to the south. It has always been the case, and so continues to be, that by the force of the sea, proceeding from violent south-east storms and extraordinary tides, the mouth of the creek is sometimes blocked up by piling the sand across it, and then the waters of the brook are dammed back and the meadows on the premises of the parties are flooded. This sand, so heaped up, connects on the east with a long bluff of sand running easterly along the shore of the sound, and on the west with the upland of the petitioner. At times the waters thus dammed back make their way out themselves through the sand thus cast up, at what was the mouth of the creek at the time such obstruction was made, and west of this, anywhere along a distance of several rods of the sea front of the petitioner's premises ; and by the action of the water in such cases the petitioner's upland has been considerably washed away. Frequently however the proprietors have opened this sand bank to let the waters out, and until the petitioner bought, the usual place for this has been at what was the mouth of the creek at the time the obstruction was formed, as being the boundary between the premises. The petitioner since his purchase has opened a way for the escape of the water further east than what, at the time, had been the usual mouth of the creek, and this has occasioned the controversy between the parties. The creek on its north

bank, where it skirts the upland of the petitioner, has gradually encroached upon the upland, and been thrown further to the northward, and this to the extent of several feet since the petitioner has been the proprietor. There is no land however south of the creek but sand bluff thrown up by the sound and beach. The gales and tides have otherwise varied more or less the position of the mouth of the creek; but when its mouth is at any time blocked up, the obstructing bank can as readily be opened where the mouth was when the obstruction was formed as at any other point, and if it breaks out of itself at any other point, can as readily be restored to the old place; and there is no difficulty in finding such place. The other variation in the mouth of the creek is a gradual working of the same to the westward. It is only from the point where the brook meets the creek, and thence to the sound, that there is any dispute between the parties as to the boundary line. Here they can not agree, the respondent claiming that the creek is the line of division, and the petitioner that the line lies east of the present mouth of the creek. Since the petitioner purchased his premises, there has been no action of the proprietors, or of either of them, which alters the division line between them. The committee find that the adjoining premises have never had any other division boundary at the place in question except the creek, and that any other they might fix must be arbitrary. In case upon these facts the court should be of opinion that the committee can fix such other line, they have established the same from the point where the brook meets the creek to the shore of the sound terminating at the shore somewhat east of the present mouth of the creek, at or about the place where the mouth has probably been in the course of the last half century.

The report then proceeded to describe the line and bounds established by the committee.

The report was accepted by the superior court and the case reserved for the advice of this court.

*Phelps,* for the petitioner.

The bounds erected and established by the committee

should be confirmed by the superior court. 1st. The only condition in the statute expressed or implied, upon which the court could have appointed a committee, was that the bounds between the parties were lost, or from some cause had become obscure or uncertain, and the parties could not agree to establish the same. Acts of 1859, chap. 65. This was a preliminary question for the court, and was the only issue legitimately involved in or raised by the bill and answer; and the court by sending out a committee to erect and establish the bounds, are presumed to have determined that question. 2d. It is no part of the authority of a committee under this statute, to entertain and dispose of the question whether the bounds are lost or uncertain or obscure. The law gives them no jurisdiction over that subject, and they have no power except what is expressly conferred by the statute. Their sole power and duty was to inquire into the facts as to where the bounds should be erected and established, and thereupon proceed to erect and establish them and report the facts and their doings to the court. And the only remaining duty of the court, in the absence of a remonstrance, is to find whether the parties have been duly notified and had an opportunity to be heard, and, if they so find, to confirm the doings of the committee in erecting and establishing the bounds. The committee under their appointment did erect and establish the bounds between the parties. They alone had jurisdiction to do so. Their action in the premises, being regular and pursuant to the statute, is final and conclusive upon the parties, as much so as the action of a board of fence-viewers upon the question of the sufficiency of a fence, and for the same reason, to wit, that the statute has made them the sole judges. *Fox* v. *Beebe,* 24 Conn., 271. 3d. If the committee had jurisdiction to determine whether the bounds were in fact lost, or uncertain, or obscure, sufficient appears from their finding to establish the fact that the bounds, if not lost, were at least uncertain or obscure. The changes in the mouth of the creek clearly make the line uncertain. It is enough that it is impossible to determine with accuracy just where the ancient bed of the creek is, supposing that to be the true boundary.

*R. D. Smith*, for the respondent.

It is clear upon the facts found that there has been no lost boundary. The creek is found to have always been the boundary, and that the deeds of the adjoining lands have always bounded on it, except in a few instances ; that this has always been recognized as the boundary ; and that the parties have done nothing to change the division line between them. It is therefore not a case to which the statute applies. The committee have fixed a line only upon the contingency of the court being of opinion on the facts that they have the power. It can not be presumed or claimed by the petitioner's counsel that the court first found that it was a case of a lost or uncertain boundary, and appointed the committee solely to fix the boundary. It appears by the plea filed by us before the appointment of the committee, that we objected to the whole proceeding because it was not a case of lost boundary. The committee have not proceeded to fix the boundary, as they would have done in that case, but have found the facts, and have fixed the bounds only in case the court shall be of opinion that it is a case in which they have power to fix them. The committee themselves report that there is nothing to guide them, no lost boundary, but that if they do not take the creek as the line, the line which they fix must be wholly arbitrary. This proceeding is not a substitute for ejectment, and a process for taking away one's land ; but is only for fixing bounds where the bounds are lost. The committee can merely restore the bounds, not fix new ones. The shifting of the mouth of the creek by slight and gradual changes would carry with it the line between the parties, so that the creek and its mouth would be the true line even if it be established that they are not in the same place where they formerly were. 2 Washb. on Real Prop., 451.

BUTLER, J.   We do not concur in the construction of the statute claimed upon the argument.

The statute in terms gives a general power to the superior court " as a court of equity," in case boundaries between two

or more adjoining proprietors have been lost or become obscure or uncertain, and a " petition in equity " is brought, to order such lost or uncertain bounds to be erected and established. This grant of power is followed by a permissive authority to appoint a committee of freeholders for that purpose, and a form of oath to be taken by the committee, with a provision that they report " *the facts*," and " *their doings* " relative to the bounds, to the court, who may disapprove, or approve and confirm by a decree, &c.

We find, therefore, a grant of equity jurisdiction in respect to boundaries between two or more adjoining proprietors, and a provision requiring that the committee be freeholders, but nothing which confers any special power upon the committee which they would not possess if appointed under the general power of the court as in other cases.

" The issuing of commissions to ascertain boundaries," says Judge Story, (1 Eq. Jur., § 610,) " is certainly a very ancient branch of equity jurisprudence ; " and there can be no doubt that our statute conferring equity jurisdiction upon the superior court, (Rev. Stat., tit. 5, sec. 20,) is broad enough to embrace that branch, as well as every other. But that branch of equity jurisdiction was necessarily limited in extent by the rule that equity will not interfere where there is adequate remedy at law. It is limited therefore by a course of decisions to cases where there is some peculiar equity attached to the controversy respecting the lost bounds, arising out of the fraudulent or negligent misconduct of the respondent, where it is his duty to preserve or protect the boundaries, and they can not otherwise be found or restored ; to cases where a resort to equity is necessary to prevent a multiplicity of suits ; and to cases where the power is necessarily exercised, incidentally, in furtherance of another equity. Controversies not presenting any peculiar equity, like the one in question, have been left to be settled by proceedings at law. But where, under the limitations established by the decisions, the jurisdiction of equity attached, the proceedings were substantially like those provided for in this statute, and in effect it is noth-

ing more than an extension of jurisdiction to a class of cases not before embraced within that jurisdiction, because there was remedy at law.

This view is confirmed by a reference to the history and purpose of the law. The importance of having fixed bounds between adjoining proprietors was recognized early in the history of the state. In 1719, when all equity power remained in the General Assembly, and when every adjoining proprietor was required to bound every parcel of his land " with sufficient mere stones, at least eighteen inches long, whereof six inches should be above ground," under a penalty of one dollar and sixty-seven cents per month, and perambulate his lines once a year if requested by the adjoining proprietor, under a penalty of eighty-four cents per day for every day he should refuse, an act was passed providing for the " fixing " of " lost bounds " between adjoining proprietors by freeholders appointed by an assistant or justice of the peace. But that act transferred no title or possession, and prevented no proceedings at law, and unless acquiesced in, the only effect was to make a *prima facie* case in favor of the plaintiff. That statute was practically of little use, for the want of force and finality in the proceedings, and was omitted in the revision of 1821. In 1832 another statute was passed of substantially the same character, with a provision that if the parties did not abide the action of the freeholders, and litigation ensued, the plaintiff, if unsuccessful, should pay double cost. That statute was also found to be of little practical importance, for the same reason, and in 1859 the statute in question was passed, placing the power in the superior court " *as a court of equity*," for the obvious and necessary purpose of making its decree final and conclusive upon the parties, and giving it all the effect of a decree in equity. We think it entirely clear, therefore, that the parties stand before the court as in any other case where the facts have been found by a committee, and the report is accepted establishing them as the facts of the case on which the court is to act ; and that it is competent for the court to disapprove the doings of the committee and dismiss the petition, or approve, confirm and establish them by a suitable de-

cree ; and that the question whether the facts will justify the erection of the bounds fixed by the committee, and their establishment by this court, is now legitimately before this court.

It appears from the facts found that the tracts of the parties corner at a beach on Long Island Sound, where there was originally the mouth of a small creek, which was made the boundary between them ; that the mouth, and the portion of the creek immediately connected with it, has been subject to sudden filling and change by violent southeast storms; and that by the operation of these storms, and the formation of new openings, natural or artificial, the mouth has been changed to the westward, away from the original line between the tracts. If this has been the result of imperceptible accretion, the petitioner must abide it, as an incident attached by law to the title of those who bound their lands on a stream which may thus imperceptibly change its direction or bed. But it is found that it has resulted from a series of avulsions, obliterating the mouth and bed for the time, and thus working it to the westward, as it worked a new bed for itself, or a channel was opened to let off the water, and incidentally and gradually working the creek in the same direction, and the question is open whether such a change presents a case of lost or obscure and uncertain boundary.

What then is a lost boundary ? It is a boundary which has lost its distinctive character as such, by removal, displacement, decay or change, so that it no longer answers the purpose of a bound in defining the true line between the tracts. And it is immaterial whether it be a natural object or an artificial one. A tree that has been turned over with its roots by a gale and is lying in the vicinity, but away from the corner or the line, has lost its place and its distinctive character as a bound. So if cut down, and the stump has decayed and become invisible. So of a stone which has been displaced, although remaining near the place. And so of the mouth of a stream which has been filled by a sudden avulsion, and has broken for itself a new mouth at a distance more or less remote from the line. It has *lost*, by a sudden removal from it,

place, or a series of sudden removals from the line, its character as a bound, and although once certain has become uncertain and unreliable as a boundary.

But there is another kind of uncertainty in this case as in other cases. It was uncertain whether the boundary though changed had not been acquiesced in, so as to change the location of the line between the tracts. If the mouth of the creek, although changed by sudden avulsions on to the land of the petitioner, and away from the true line, involving as a consequence a change in the connected creek, had at any time been acquiesced in with knowledge of the facts, as still the boundary, for the period of fifteen years, in any particular position, it would establish a new line between the parties at the place where it was so acquisced in ; (*Jackson* v. *Mc Connell,* 19 Wend., 175 ;) and if such fact had been found, unless it also appeared that the committee had fixed the bound on that line, we should advise that it be recommitted, or the petition dismissed. But from the facts found it does not appear that any new line has thus been established between the proprietors of the tracts, or that there ever was such acquiescence in any new position of the boundary for any considerable period. The mouth of the creek seems to have been a shifting boundary, often filled up, sometimes opening the old and sometimes a new channel for itself; sometimes opened by the owners ; and when opened by them, usually but not always opened at the place where it was when then immediately filled up ; and the gradual changes in the creek seem to have been incidental to these changes of its mouth. It is obviously impossible, therefore, to say that any new or particular position of the boundary has been so acquiesced in by the former owners of the tract of the petitioner as to establish a new line of boundary between them, or that the position of the mouth at the time the petitioner bought had been acquiesced in at all, so as to conclude the petitioner respecting the boundary.

On the facts found the committee, so far as they had power to judge, did so correctly, and proceeded to fix a bound between the parties. They did not restore the old bound by opening the creek at the place where they thought the line

formerly was, but arbitrarily, as they say, substituted a different bound. In this we see nothing objectionable. The object of the statute, and of courts of equity, when they establish boundaries, is certainty and permanency in respect to the line between the parties. The experience of the past, as found by the committee, shows that neither could be obtained by restoring the mouth of the creek to its original position, and that if restored it would be liable to immediate removal. Owing to the position of the land and its exposure to storms, it was an improper boundary, and the committee properly substituted one which would be permanent and reliable, and the respondent has no just ground of complaint in that respect.

The committee further say that they are not certain that they have ascertained the exact line. But they also say that the mouth of the creek has probably been as far east within the last half century, and it is apparent that the change in the creek resulted from the change of its mouth, and there is neither pretense nor possibility that the boundary could change otherwise than to the west. We think their doings in that respect also should be approved, and we advise that a decree be passed accordingly.

In this opinion the other judges concurred.