[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brings this action by complaint dated December 6, 1993 and pursues the action by Amended Complaint filed April 12, 1994. The amended complaint is in three counts. The first count against Scott B. and Tina A. Sheppard, is in breach of contract to purchase the plaintiff's real estate. That count against Sheppard has been withdrawn prior to trial.
The second and the third counts are asserted against the defendant Jerome Dietrich. The second count claims, "Interference with Contractual Rights." The third count is in breach of contract, claiming that the "defendant Jerome Dietrich breached his agreement to accept the plaintiff's unilaterally newly constructed stone wall and settle any and all disputes over the propriety of the location of said stone wall.
The defendant Jerome Dietrich by revised answer of December 29, 1994, filed a "By way of Counterclaim," in two counts. Count one claims that the plaintiff unilaterally obstructed the defendant's right of way and removed and destroyed a gate across the entrance to the right of way. The second count alleges that said activity of the plaintiff was intentional and malicious. The counterclaims seek damages, punitive damages and attorneys' fees.
The court finds the following facts. The plaintiff purchased his property from Richard D. DeGemmis and Robin C. DeGemmis, by warranty deed dated August 20, 1996, recorded in the land records of the town of Marlborough, Connecticut on August 25, 1986. The description of the property in the plaintiff's deed makes reference to a certain map entitled Subdivision Plan for Richard Robin C. DeGemmis, Jones Hollow Road, Marlborough, Connecticut," 6/10/86 Revised 6/23/86. CT Page 10102 The property, in the deed, is referred to as "Parcel B" on said map. The deed and the map are in evidence as plaintiff's Exhibits 1 and 2 respectively.
The angles and the linear dimension which appear on the map are consistent with the description set forth in the deed. The description in the deed starts with the following: "Commencing at an iron pin in the assumed southerly road line of Jones Hollow Road . . ." The map, however, does not delineate this "iron pin" by the customary use of a small circle "(i.p.)" as are other iron pins delineated on the map. The eastern boundary is delineated on said map as what would appear to be a direct southeasterly extension of a line captioned "approx. Town Line Marlborough — Hebron," which line is carried on said map for a distance northerly of the northeast corner of the devised property shown on said map, but does not extend to any monument.
The transfer of property by said deed states "Said Parcel B is subject to a R.O.W. as shown on said map. Said R.O.W. is recorded in the Marlborough Land Records in Volume 68 at page 935."
The right of way referred to in the deed and delineated in the above-referenced map is the easement which is the subject of the present dispute. That deed, captioned "Easement for Right-of-Way," was entered into evidence as plaintiff's Exhibit 3 in this action. The easement right of way description commences:
 "Beginning at a point in the town line between Hebron and Marlborough . . ."
The place of beginning is not at a corner, but is north of the southeast corner of the easement deeded. The description runs south along the town line, thence northwest 16 feet, thence north to a stone wall, thence east to a point in "the said town line between Hebron and Marlborough, thence south west in said town line to a point of beginning.
There is no question but that the east boundary of the plaintiff's property and the east boundary of the defendant's easement is the town line of the adjacent towns of Hebron and Marlborough. The problem is obvious. No one knows the exact location of the town line. The problem is made more complex CT Page 10103 because the neighbor to the east, a stranger to this litigation, also borders on the town line.
The parties are at issue as to where, physically, is the boundary line between the Town of Hebron and the Town of Marlborough, and hence where is the easterly boundary of the fee and hence of the easement?
Prior to the plaintiff having raised the issue of the physical location of the easement the defendant had no question in his mind, or no uncertainty, as to the physical location of the easement. The original grant of easement was from the plaintiff's predecessor in title to the defendant's predecessor, Leslie Dietrich, the defendant's father, by grant of easement deed on July 11, 1958. See defendant's Exhibit E. A map was drawn up captioned "Map of Property of Leslie Dietrich" designated "revised to July 11, 1958," entered as defendant's Exhibit B, delineating the easement. The description on the unrecorded deed and the metes and bounds map correspond.
For some reason the easement document appears not to have been filed on the land records. But the easement map was filed on the land records, Volume 1, Page 69. See plaintiff's Exhibit 4.
On July 11, 1985 the predecessor to the plaintiff granted an easement which was a reaffirmation of the 1958 grant. The description of the 1985 grant is identical to the 1958 grant to and by the predecessors of the parties. The four additional terms of the original grant are also the identical terms of the 1985 reaffirmation.
Neither the 1958 grant of easement, nor its map, nor the 1985 reaffirmation of easement make any descriptive references to an "iron pin" for the northeast corner.
The 1986 map, in connection with deed to the plaintiff, does not describe or identify any iron pin on the northeast boundary corner, although the deed does refer to an iron pin. Although there are apparently a number of iron pins located in this vicinity now, at the time of the 1995 survey conducted for the defendant for issues presented by this litigation (defendant's Exhibit C), none of these pins are identified as being a, or being the, pin referred to in the plaintiff's CT Page 10104 deed.
The court notes that in plaintiff's Exhibit 8 the plaintiff refers to "iron pins installed by Richard Mihok, consulting engineer, dated May 8, 1987", which date is many months after the plaintiff's closing. As the plaintiff did not call Mr. Mihok to testify, nor is it known whether he is available, questions concerning the northeast boundary point of the fee and the easement remain a mystery. Even if one assumes that Mr. Mihok put in a northeast corner pin for redefining the June 10, 1986 survey in connection with the deed to the plaintiff that would not be binding upon the defendant, who had acquired his easement of record prior thereto, without reference to any existing iron pin, in 1985.
The following additional facts are appropriate. The easement is sixteen feet wide. The defendant and his family have used the area thought by them to be the area of the easement since 1958. They have always used the sixteen feet to the west of and adjacent to the two large trees, a thirty-six inch in diameter oak tree and a twelve inch in diameter hickory tree, for vehicular and pedestrian ingress and egress to their two acres on which sits their small cabin, and which appears by the maps to be landlocked.
There are worn wheel ruts in the sixteen feet which they have been using. This is open and obvious to everyone. The defendant contends, and the court credits, that a motor vehicle cannot drive straight through a thirty-six inch thick oak tree or an eighteen inch thick hickory tree. The court finds, by the photographs of the defendant, Exhibit D-18, that the distance between the huge oak tree and a ledge outcropping to its east is such as to make it improbable if not impossible that a vehicle could be expected to make that passage to the east of the oak tree.
It is, of course, possible that the oak and the hickory were mere saplings at the time of the easement and were merely avoided as a matter of convenience. However, there is absolutely no evidence before the court to arrive at that conclusion.
There was always a makeshift gate at the north (street) entrance to the easement. That was required by the 1958 grant. The defendant replaced the gate, in 1984 or 1985, by CT Page 10105 a metal gate, which was 22 feet in width to accommodate the entrance to the 16-foot wide passageway, but at an angle to conform to the contour of the road. This gate has disappeared mysteriously, though the plaintiff testified that he has no knowledge of how or why. The gate was at the beginning of the area which the plaintiff unilaterally blocked off. One of the gate posts or both has mysteriously implanted itself at the other end of the easement, some 150 feet away, which would apparently tend to now delineate the easement in the fashion preferred by the plaintiff.
Without advance notice to the defendant the plaintiff blocked off a substantial portion of the sixteen-foot wide area being used by the defendant and constructed a stone wall down the north to south length of the area being used by the defendant. This left only several feet between the new wall and the oak tree, thereby making vehicular traffic impossible along the customary line. He left a small gap in the stone wall 80 that a vehicle could squeeze by the oak tree in a very awkward type of maneuver, which the plaintiff apparently believes to be a generous unilateral temporary accommodation for the defendant.
In response to the defendant's protest, in a letter from the defendant's attorney, the plaintiff proposed to himself cut down the oak tree and the hickory tree in exchange for an agreement that the defendant accept the unilaterally constructed north/south wall as the east boundary of the defendant's easement. The plaintiff asserted that he was relying on a survey by Richard Mihok, consulting engineers, dated May 7, 1987. This "survey" was for the purpose of obtaining a certificate of occupancy, many months after the purchase of the property, which purchase was subsequent to the recorded easement of the defendant. The defendant, though with obvious misgivings, seemed to be agreeable to discuss the matter. The defendant hired a surveyor, a Mr. Kent, who seemed to be basically in agreement with Mr. Mihok. Mr. Kent was not called by either party. Naturally, if Mr. Kent merely accepted the northeast pin placed in the ground by Mr. Mihok without an independent analysis of the location of the town line then the results of the survey would have to be very close to identical.
On January 27, 1992 the defendant's attorney wrote to the plaintiff stating "Inasmuch as our surveyors did not concur as CT Page 10106 to the exact location of the line nearest to your wall, may I suggest that you send me a copy of your surveyor's map. If it is in accordance with our understanding of where the line is now to be agreed upon, I believe that it would be appropriate to record that map along with a formal written agreement. (Plaintiff Exhibit 11)
The plaintiff responded by letter dated February 3, 1992, stating, ". . . I will not answer to any questions further by you as I have already answered to your letter dated November 25, 1991." The plaintiff never furnished the defendant a copy of the survey which apparently forms the basis of the plaintiff's claim as to the proper location of the easement.
The defendant was very uneasy about the prospect of entering into an agreement which would cause him to be a party to the cutting down of what he believes to be the line trees.
Both of the easements, 1958 and 1985, required that he remove all brush and trees except "line trees." Defendant's Exhibit E, Plaintiff's Exhibit 3. The term "line trees" are not defined. However, in the absence of other monuments, such as iron pins, boulders, rock walls, etc. along the property line, the town line, it would appear that the Oak and the Hickory, due to their size and apparent age, may well be line monuments, referred to in the easement as "line trees." Couple this with the fact that travel had always been to thewest of these trees, and that vehicles can't drive through trees, this would cause any rational person to be suspicious of a proposal to cut down those trees. Further, the defendant testified that the successor to the original grantor of the easement of 1958, Mr. DeGemmis, who reaffirmed the easement by the easement deed of 1985, agreed with the defendant as to the location of the easement. Mr. DeGemmis was not called to testify. The court credits this statement not for the truth thereof but only to show the defendant's state of mind as the discussions progressed.
The court notes still another factor which caused doubt in the mind of the defendant. The easement map on file, plaintiff's Exhibit 4, shows the westerly boundary of theeasement, near its north extreme as being five feet east of the east end of a stone wall which runs east and west and adjacent to the northeast curve of Murphy Road. The original of the easement map, the yellowed old copy which has been in the possession of the defendant's family, shows a penciled-in CT Page 10107 extension of the wall for five feet to the east, thereby meeting the west line of the easement. This old yellowed map also shows the designation "IP" at or within a foot or so of the point where the long ago extended wall was extended to meet the easement. The defendant recalls that there was an iron pin at end of the wall at one time, but that was years ago.
The court notes, in reviewing the photographs of this wall, that there appear to be two separate types of stone comprising the present wall. The longest portion of the wall, from west to east, are rounded stones without sharp angles. The east end of this section, for approximately five feet, appears to be higher than the adjacent section to the west, which would cause one to speculate as to whether this five feet is the footage long ago added to the original wall to meet the west boundary of the easement. There is a pin at the face of the wall, in defendant's Exhibit C. If this is the old pin marking the northwest corner of the easement then the new wall constructed by the plaintiff would intrude approximately 7.5 feet into the easement. And the existing oak tree would be at the east boundary of the easement, thereby verifying the defendant's customary use as being the actual path of the easement.
The defendant testified that there was a makeshift gate. When he replaced it with the metal gate, with the help of the boy scouts, in 1984 or 1985, the old gate pole was right at the end of the then existing stone wall, and where the pin once existed at the place where the easement had long ago been set. The new iron gate is the gate which has mysteriously disappeared, and the gate pole which was at the east tip of the old wall is the post which at or about said time of gate disappearance, transplanted itself to the south end of the easement.
It was through this space at the east end of the old north wall, as it existed prior to the plaintiff's purchasing the property, that the defendant and his predecessors have consistently used as the west boundary of the easement. The plaintiff, first by using roughly strewn boulders, and then by extending the old wall a distance to the east and then erecting a wall running south, effectively blocked off the defendant's customary passageway, unilaterally cutting about 8 feet, possibly more, of the entrance to, and throughout the CT Page 10108 length of the customary passageway.
The defendant was ill at ease, which may be an under-statement, concerning the prospect of what the plaintiff proposed after the plaintiff's blockage of the passageway 80 as to give imprimatur to the plaintiff's unilateral acts. The fact that the entrance had always been at the east end of the old stone wall, as it turns out apparently long ago extended as indicated on the old map to meet the westbound of the easement, should realistically have given the defendant, and did give him, serious cause for serious concern that the plaintiff's proposal was ill conceived, at best.
The defendant retained J. Robert Pfanner, a civil engineer, to conduct a survey of the property to attempt to establish the boundaries of the easement, in connection with this litigation, Mr. Pfanner prepared a map entitled "Plan Showing 16' Right of Way belonging to Jerome F. Dietrich" which map is dated June 15, 1995, subsequent to the commencement of suit by the plaintiff. He was retained in November or December 1994.
The map is entered as Defendant's Exhibit C. Another map had been originally prepared by Mr. Pfanner, which apparently was based on certain assumptions. The map submitted as defendant's Exhibit C is a later revised map, though not 80 labeled.
The revised map prepared by Mr. Pfanner indicates the line of the easement as generally in accordance with the defendant's understanding of the location of the right of way. However, it uses as a starting point a 42" oak tree which is located some 3,000 feet south of the Dietrich property, rather than using a straight bearing from the remote southerly town line monument on the "southerly side of west road." Although this gives some credence to the concept of line trees, why then would the line on the map miss the oak tree on the east of the property in dispute (which is of similar size and presumably similar age) by a few feet, which east oak tree would logically and geometrically appear to be one of the "line trees?"
The questions raised by this survey leave as many questions unanswered as do the contradictory survey upon which the plaintiff relied, as referred to heretofore. For CT Page 10109 instance, the map, though using the Hickory tree as being on the line, does miss, to the west, the oak tree and uses rather a 36" stump located south of the line oak trees The survey delineates iron pins but does not intersect any of the pins. It does at least utilize an alleged north "town line monument," which is 680.74 feet north of the property and north of the alleged location of which is in dispute. This survey places the plaintiff's newly and unilaterally constructed stone wall, by the map's scale, as an approximately ten feet of intrusion into the right of way, which would leave the defendant with six feet of right of way if the plaintiff's wall remains. For all practical purposes the wall would extinguish the right of way for any vehicular traffic.
 II
The plaintiff placed his property on the market after the negotiations broke down, having effectively terminated further discussion by his letter of February 3, 1992 to the defendant's attorney. A bond for deed to purchase the plaintiff's property was signed by one Scott B. and Tina A. Sheppard on June 5, 1993. Plaintiff's Exhibit 13B. The bond for deed stated title would be transferred subject to "easements of record."
The Sheppards claimed that the plaintiff never told them about the defendant's easement, and that they came to know of it by accidentally seeing a map or document inadvertently left in sight when they visited the plaintiff's house. The Sheppards also claim that upon learning of the existence of an easement the plaintiff told them that it was only for pedestrian traffic, whereas further inquiry by their attorney revealed that it was for vehicular traffic. The Sheppards gave notice of rescission of the contract, demanding return of the deposits (Plaintiff's Exhibit 13d)
The plaintiff sued the Sheppards in this action. The case has been withdrawn against the Sheppards. The withdrawal terms, if any, have not been made known to the court, and would be irrelevant in any event.
The property was eventually sold by the plaintiff to another party in January 1994 for $235,000.00. The buyers are a Mr. and Mrs. James Branco. In connection with that sale the CT Page 10110 plaintiff was required to escrow $3,500.00 because of the question of the stone wall. (see Plaintiff's Exhibit 14; post-trial memo of plaintiff, p. 5). The plaintiff was required to move part of the stone wall, moving it a slight distance to the west. He did some of the work himself, and I forfeited $1,900.00 of the deposit for not completing the move.
The court assumes that this was the result of yet another survey. Whether this was based on Mr. Mihok's survey, with minor adjustments after merely accepting that survey's setting of pins, or whether it was a new survey, is not known to the court. In either event, there are at least four surveys, none of which are in agreement with each other. As concerns this action the boundaries of the easement are totally undetermined and speculative at best.
The plaintiff, by letter of July 28, 1993, by his attorney, notified Raveis Real Estate, the agent of the plaintiff seller, that there was an ongoing dispute as to the easement boundary. The letter suggested that Raveis set up a meeting between Mr. Dietrich and "any serious buyer and any clients 80 that the possibility of compromise or settlement of the dispute may be discussed, thus avoiding future problems for the parties." Plaintiff's Exhibit 13a.
 III
Count Three as against the defendant Dietrich.
The plaintiff brings this count against the defendant claiming that "the defendant Jerome Dietrich has breached his agreement to accept the stone wall and settle any and all disputes over the location of the stone wall."
This court determines that there was no such contract. It is elementary that there must be a meeting of the minds to constitute a contract. At the very least the defendant was entitled to review the survey upon which the plaintiff relied, as requested in defendant's letter of January 27, 1992. The defendant, in his letter of November 21, 1991, enclosing a copy of another map, showed that the wall was encroaching in the right of way (Plaintiff's Exhibit 7), even if one assumed as debatable, and subject to verification the contention of the plaintiff that the wall was built outside the right of way CT Page 10111 (Plaintiff's Exhibit 10). Further the defendant states, in the letter of January 27, 1992 (Exhibit 11) "If it is in accordance with our understanding of where the line is now to be agreed upon . . ." Read as a whole the letter implies that the line is to be established in accordance with the understanding of the parties to be made after analysis of the various maps.
The plaintiff's response was direct — "I will not answer any questions further by you . . ." The map was never sent out. The wall was never offered to be moved to conform to even the questionable survey commissioned by the defendant. The plaintiff simply terminated the discussion in the most emphatic fashion.
Furthermore, it is obvious that the defendant used sound judgment in not getting involved in cutting down the suspected line trees, either as a direct action on his part or as a willing participant in that activity. From a civil liability standpoint General Statutes § 52-560 would expose the defendant to the payment of three times the reasonable value of cutting down the oak tree and/or the hickory tree, and he would have at best a questionable basis for alleging that the trees were actually owned by him or even within his easement. Further, General Statutes § 53a-117 causes the reckless damage to property of another, which obviously includes trees, to be a criminal offense. A contract which calls for the commission of a criminal offense would inherently be against public policy and unenforceable ab initio.
The concept of unilaterally pushing this easement onto the property of the freeholder to the east would be absurd, and has no precedent at law.
The evidence of the defendant's surveyor proffers that the hickory tree is partially on the land of another, to the east, and the oak tree is slightly, though completely, on the property of another to the east. This is not a situation where an easement is surrounded by property of the fee owner and where moving the easement is totally a private matter between those parties, and where the cutting of trees is the sole legal prerogative of a property owner upon whose land the trees are unquestionably located.
Aside from the potential illegality of the cutting of the CT Page 10112 trees, the court finds that there was no contract as between the parties.
The court finds for the defendant on the third count of the complaint.
 IV
The second count of the complaint alleges a claim for tortious interference with contractual relations.
The claim of the plaintiff is that because the defendant wrote to the plaintiff's real estate advising of the ongoing dispute as concerns the exact location of the defendant's right of way, and inviting any serious purchaser to meet with Mr. Dietrich to discuss the possibility of compromise or settlement of the dispute, inviting discussion to avoid future problems, that this constitutes tortious interference with contractual relations.
The plaintiff cites, in support of this claim the case ofRobert L. Weiss and Associates, Inc. v. Weiderlight, 208 Conn. 525
(1988).
 "For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . . Requires the plaintiff to prove at least some improper motive or improper means . . . A claim is made out only when interference resulting in injury to another is wrongful beyond the fact of the interference itself."
Weiss Associates, Inc. v. Wiederlight, supra, P 536.
As a start, the court finds that the statement made by the defendant that there was an ongoing dispute between the defendant and the plaintiff concerning the exact location of the right of way was absolutely true, as a matter of fact and CT Page 10113 as a matter of law. There was certainly no malice in the statement, nor was there any improper motive. The defendant was merely hoping that he and any potential buyer could come to an accommodation as to the easement, so that an understanding could be arrived at, rather than to have a new party embroiled, probably innocently, in the existing genuine dispute.
Bearing in mind how the plaintiff handled the matter with the dispute between the plaintiff and the Sheppards, to wit the claim of lack of candor of the plaintiff, claimed by the Sheppards, it is obvious that if the plaintiff had told the Sheppards about the boundary dispute he would have no cause of action against the defendant for telling the Sheppards the same things The plaintiff, not having received from the defendant an executed and certified letter of agreement, which the plaintiff had insisted upon, must have known that there was no agreement. If anything, the defendant's offer through the agent, in its conciliatory terms, would have been in furtherance of the plaintiff's ability to sell the property to a purchaser who, prior to purchase, could work out the problems of the easement with the obviously non-hostile defendant prior to purchase. To the extent that the plaintiff would have preferred to sell the property to an innocent and oblivious third party, thus passing off the problem to someone else, neither law nor equity would support that motive. The letter of the plaintiff, acting in a rational and sensible manner, is precisely the reverse of intimidation, molestation or malice.
The court finds for the defendant on this second count of the complaint.
 V
The Counterclaim
The defendant asserts counterclaims against the plaintiff in two counts. The defendant claims in the first count that the plaintiff has obstructed the right of way by the placement of a stone wall which has presented the defendant from using the right of way. Further the defendant claims that the plaintiff removed the gate across the right of way, by which terms of the easement the defendant was obliged to maintain the gate. As to the gate, the plaintiff has denied this CT Page 10114 allegation. Regardless of the fact that the court is suspicious of the plaintiff's testimony in this regard, yet there is no affirmative evidence upon which the court can conclude that the plaintiff removed the gate. Hence, as to the gate the court must find for the plaintiff as concerns any claim for conversion or theft of the gate. Also the duty to maintain the gate is one owed to the plaintiff under the terms of the easement. The plaintiff has asserted no claim against the defendant as concerns any failure on the part of the defendant to maintain a gate. Though this claim may be raised in the future by the plaintiff's successor, yet the court must find that the claim is not proven.
The second count incorporates the allegations of the first count, and claims that the alleged obstruction of the right of way by execution of the wall was done intentionally and maliciously to deprive the defendant of his easement rights, and claims punitive damages.
It is unnecessary, in this decision of the court, to restate the multitude of facts found by the court in arriving at the decision on the plaintiff's claims, as heretofore determined. Those findings are incorporated herein for the purpose of addressing the counterclaims.
This court determines that the present state of the evidence is such that the easterly boundary of the plaintiff's land, and hence the easterly boundary of the easement, that is to say the town line boundary between Marlborough and Hebron is not capable of being determined as matters presently stand. The various surveys are contradictory. Each and all of them are based upon various assumptions or judgment choices which are not factually supportable, resulting in a circumstance where there is disagreement even amongst the surveys which are proffered to support the plaintiff's side of this dispute. Conversely, the history of the defendant's means of egress, particularly his assumption of the large Oak tree as the eastern boundary of the easement does not appear to be completely supported by the engineer which he last retained and is in disagreement with the engineer's own earlier survey.
The evidence presents a classic example of the apparent use of trees as "line trees", as monuments, and the inevitable ultimate confusion which is bound to result therefrom. The concept of "line trees", used in the conditions of the CT Page 10115 easement, had to come from somewhere in the chain of title or in the original setting of the town boundary line. Although this practice was customary in rural New England in an era where ten or twelve feet may have made little difference in farming communities when landowners held large tracts of land, much of which was untillable and hence of little practical value, yet that era has passed. The present dispute presents a classic illustration that the expediency of the past presents serious contemporary problems in this area of the law.
The court concludes that the east boundary of the property and hence the easement is for all practical purposes lost and uncertain. General Statutes § 47-34, the origin of which is at least one hundred and forty years old, (see Perryv. Pratt, 31 Conn. 433 (1863), has long been recognized in this state as a realistic means of resolving problems such as this:
 "When the boundaries of lands between adjoining proprietors have been lost or become uncertain and they cannot agree to establish boundaries, one or more of them may bring a complaint to the superior court for the judicial district in which the lands or a portion of them are situated . . . ."
See also F. A.K., Inc. v. Sleeper, 161 Conn. 505, 512 (1971) as to the applicability of this statute in cases such as this.
The statute further provides that the committee shall give notice to all parties interested in the lands to appear before it. In the instant case the interested parties may well be the plaintiff, the plaintiff's successor, the freeholder bordering on the east, the town of Marlborough, the town of Hebron, etc. In this fashion all parties to the boundary have notice and an opportunity to be heard, in a opportunity to be heard, in a procedure of substantially lessened complexity and hostility. This is a far more sensible procedure than to unilaterally cut down trees which may be on someone else's land, with the ensuing inevitable legal consequences.
Whether an action to quiet title, or an action to CT Page 10116 determine prescription (General Statutes § 47-37), are alternative remedies need not be determined by this court. Suffice it to state that unilaterally erecting stone walls is not a legally acceptable alternative, even though in the future it may possibly be determined that the plaintiffs may have guessed almost correctly.
If it should ultimately be determined that the wall intrudes upon the defendant's easement, with the consequence of substantial blocking or destruction of the plaintiff's easement, the plaintiff's successor in title, the present holder of the subservient estate might be expected to be responsible for remedying the intrusion. See Corva v.Waterbury, 141 Conn. 719 (1954). Yet that would not, of course, exonerate the herein plaintiff, as it was he who actually unilaterally constructed the wall.
The determination of the defendant's counterclaim cannot be decided until the physical location of the easement is determined by a proper legal proceeding. This court does conclude that a determination of the defendant's counterclaims, one way or the other, as if on the merits, under the circumstances herein, is simply not capable of being made at this time.
The court determines that this counterclaim was brought prematurely. As such, no judgment on the merits, one way or the other, is warranted.
 ". . . here a bill based on a legal title is brought in a court of equity for partition and the title is in dispute or is doubtful or attended with suspicious circumstances, the court is without power to decree petition until the title has been settled by an action of law. In these circumstances the court is without power to direct an issue out of chancery to try the title, but will dismiss the bill without prejudice or retain the bill and stay the suit for a reasonable time to give complainant an opportunity to establish his title at law, the latter being the customary practice.
CT Page 10117
Abel Carvahlo v. Hiram Kellogg, 3 Conn. Sup. 100, 101 (1935).
The evidence in the case, which is admitted and undisputed, is that the plaintiffs have removed to and taken up residence in the State of Colorado. The plaintiffs have invoked the jurisdiction of this court in this dispute, by the commencement of this action. A dismissal of the action, even without prejudice, may deprive the court of in personam jurisdiction to hereafter determine the counterclaims of the defendant should a duplicate action be required to be brought in the future to determine the liability of the plaintiff, if any, for the erection of the wall. Further, such later commenced action might implicate the Statute of Limitations, to the obvious unfair detriment of the defendant. Hence the court determines that dismissal of the counterclaims is inappropriate.
This court determines to stay the counterclaims for areasonable period of time to give the defendant an opportunity to effectuate a determination; at law, as to the physical boundaries of his easement. That is the "customary practice" in matters of this nature. Carvahlo v. Kellogg, supra.
The court does not determine a precise date to comprise the terminal point of a reasonable period of time.
The court does advise that any such activity be embarked upon post haste. Otherwise the court will hereafter entertain a motion to dismiss the counterclaims.
The court enters judgment for the defendant on each count of the plaintiff's complaint.
For the reasons set forth herein the court stays further action on the counterclaims, without entering judgment on the merits as concerns the defendant's counterclaims.
L. Paul Sullivan, J.